And Mr. Rotuno, is that the correct pronunciation? Rotuno, yes. I've gone by Rotuno for 60 years so I can take it today. May it please the court I'm sorry I'm so late infringing upon your lunch. But I want to start out by introducing myself. Stephen Rotuno on behalf of Prairie Rheumatology Associates, the appellant in cross-appellate. I want to start out by just reviewing briefly the memorandum of opinion and order by the trial court. Because that is the subject of all of the issues on this appeal. In that opinion, the trial court looked at the non-compete that was before it and found that it was ancillary to a contract. The trial court found that there was adequate consideration for that contract. And as a result of those two findings went on to look at the three-dimensional rule of reason test that the reliable fire equipment court gave to all of us to look at in determining whether a restricted covenant here on non-compete is enforceable. The trial court found that there was a legitimate business interest that Prairie had in its patients. That is typical and followed many cases by both appellate courts and the Supreme Court of Illinois when looking at a medical practice business. That a legitimate business interest in the patients is found. The court then said, as a result of its finding, that there was no undue hardship to the defendant to prohibit her from not practicing within the restricted area for 14 miles vis-à-vis Prairie's patients. The trial court also found that there was no injury to the public. That is, the public would not be harmed, Prairie's patients would not be harmed because Dr. Francis could not treat them. The court then did what we believe is a 180 degree shift from what the law says. That is, the court said, you Prairie, not only have to show that there is a protectable business interest in your patients, your business, you have to show a second protectable business interest. That is, you have a protectable business interest in the general public, the future patients. We submit to you, as our brief said, that that is something that no court we have found in the medical practice area has required. That is, you must show both a protectable business interest in your patients and future patients. And the reason for that is, we submit, is that it is impossible to show or know what patients you are going to get in the future to get a protectable business interest. Those patients come to you when they come to you. Now what the trial court did then is buttress that ruling by shifting to a second requirement on the injury to public aspect of the three dimensional rule of reason test. And the trial court then said, well, the general public, future patients would be harmed or injured if Dr. Francis wasn't practicing in the restricted area. This 14 mile radius from Prairie's offices. And what the trial court said was, I'm making that finding because the, I'm sorry, the trial court made that finding that there would be injury to the general public as a result of the fact that the trial court found that there wasn't sufficient number of rheumatologists within the restricted area. And as I will discuss later, as our brief showed, that finding was made with no evidence whatsoever in the record. The court then made, what I found was a second reason for saying that the public, the general public would be injured as a result of enforcing the non-compete within the restricted area to the general public, future patients, by saying it would disrupt continuity of care of patients. That finding is a red herring. The issue of continuity of care only comes up when a patient comes to a physician and is seen by the physician. Future patients, prospective patients, don't have any need for continuity of care until they become patients. Once the patient becomes a patient of Prairie or Dr. Francis if she practiced outside of the restricted area, now you may have an issue of continuity of care and the trial court ruled that when those patients became patients of Prairie, the continuity of care issue was not a factor that the court deemed to be injurious to the public. The court said Dr. Francis could not treat Prairie's patients within the restricted area. To say that you can't treat future patients who have no relationship with any doctor within the restricted area makes no sense in our view. So that's the basis of the issues that are raised here in this appeal. There's really only three issues and I just want to touch on them briefly. The first issue is the court found that there was a legitimate business interest in Prairie's patients, but then we misapplied the rule of reason test and held that Prairie also had to prove it had a protectable interest in future patients. So the court took the legal test and we believe misapplied it. So that decision by the trial court should be reviewed here on a de novo review. The second issue that's before the court is we believe that the trial court abused, although it found that there was no injury to the public vis-a-vis Prairie's patients, the court abused its discretion in finding that there was injury to the general public, that is to future patients, when there was no evidence to show that there were a lack of rheumatologists in the restricted area, or that by not allowing Dr. Francis to be in the restricted area that would diminish patient care. The only evidence on the issue of whether there was sufficient rheumatologists in the area was evidence from Dr. Francis who said, before I joined, I wanted to determine if the area around Prairie and Juliet was an underserved area. That means not enough physicians there. She was hoping to get her loans forgiven by going to an underserved area, and she testified that her findings were this was not an underserved area. The second bit of evidence that the trial court referred to was that Dr. Francis' new employer, Hinsdale Orthopedics, had their CEO testify that from his discussions with other physicians at Hinsdale Orthopedics, he believed there was a shortage of rheumatologists in the area. And when questioned, what's the area, he said, well, that's the area that Hinsdale Orthopedics practices in, and he admitted it was from as far east as Oak Park to as far west as Naperville to as far south as Joliet, a much larger area than this relatively small 14-mile radius around Prairie's office in Joliet. And the third issue that the court is going to grapple with is whether Judge Anderson-Beloff, who found that 19 months of employment by Dr. Francis, plus additional consideration, which included the ability of Dr. Francis to be considered for partnership and ownership, a 50% ownership in a lucrative practice after only 18 months of employment, she was provided with referral sources, that is, she was allowed, she was scheduled to be in the hospitals, the two hospitals that Prairie treated patients at, every fourth week so she could meet all of Prairie's referral sources. And the finding the court made that she was exposed to Prairie's patients, in fact, she got over 900 new patients between the patients that were referred to her that came to Prairie and some of the patients that she brought with her from Kankakee, and she was given management opportunities at the firm to prepare her for ownership. Judge Anderson made those findings that the 19 months plus this additional consideration was sufficient consideration under the law within the third district to allow the non-compete to be enforced, and Judge Anderson ruled that there was no right-line rule, as Appoli has argued, that you must be employed for two years before a restrictive covenant can be enforced. Judge Anderson's ruling was based upon all of the evidence, and it was a factual ruling, so therefore that ruling can only be overturned if the court found that no reasonable person could make that ruling, could ever make Judge Anderson's ruling, that is, it was totally against the manifest weight of the evidence. In light of those three issues, and I apologize, in light of those three issues, the most serious one for Prairie is the misapplication of the rule of reason test on the protectable interest problem, because we have a situation where Judge Anderson is allowing Dr. Francis to practice medicine within this 14-mile radius, but at the same time, a patient who may have been treated by her at Prairie, when they call Dr. Francis up, she has to say, I can't treat you. Look how terrible that would be to the public if Dr. Francis had an office in the same office building as Prairie, and the patient says, I want to see Dr. Francis, and both Dr. Francis and Prairie have to say, we can't treat you because the judge said we have a restrictive covenant. That's why we believe you will not see in any of the case law where you have to show in a medical case, in a medical employment case, that you have a protectable interest in the general public, in future patients, you have to show that there is a protectable, legitimate business interest, which Judge Anderson clearly found, and therefore, and all the cases that follow that, the Supreme Court cases of Bauer, Canfield, Cockerill, and Mohanty, all approved the non-compete within the restricted area. Even cases, there was the gastroenterology case, I believe, where the employer was not treating patients at one or two hospitals, and the employee said, well, I shouldn't be bound by that non-compete, and the court said, no, our Supreme Court has said, once you show a legitimate business interest in your patients, the restrictive covenant is valid, and barred the doctor, the employee, from even practicing at hospitals where the employer wasn't even servicing patients. So what we believe the trial court did was to force or carve into the rule of reason test, the three-dimensional rule of reason test that reliable fire equipment reiterated, and a new requirement, that is, you have to have a protectable business interest in future patients. None of the cases that we have seen in the medical practice area have ever required that. Thank you. The other issue that we raised is the issue of the injury to the public. Again, the evidence is clear. There's no evidence at all as to how many patients or prospective patients are in the restricted area, what the ratio of rheumatologists to patients was. That's how you show that there's not enough physicians within the area so that Judge Anderson could make a finding that the area was underserved by rheumatologists. He didn't. What we have, the evidence is that before Dr. Francis left, there were five practicing rheumatologists, and after she left, excluding her, there are five practicing rheumatologists in the area and an additional nurse practitioner who can treat follow-up patients. So there's actually more treatment of patients within the restricted area after Dr. Francis left than there was before she left. There's no evidence that any of the patients complained, that there was any complaints that they weren't seen on time. There was some testimony that it takes six to eight weeks to get a patient an appointment at Prairie. The two representatives of Prairie testified that they could see patients on an expedited basis if they were necessary. This is a practice where they consider, in all due respect to them, working full-time is four days a week. They don't work on Fridays. They have plenty of time and ability, if they want to, if patient needs to require it, to see more patients. So Judge Anderson's ruling that there was injury to the general public, future patients, because of the fact that there weren't enough rheumatologists in the area, is simply not supported at all by any of the evidence. I know my time is up. I thank you, unless there's a question. Thank you. I guess not. Thank you, Ms. Retroneau. And Ms. Prins. Thank you. Good afternoon, counsel. May it please the court. I'm Kristen Prins, and I represent Dr. Maria Francis. She is the appellee and cross-appellant in this matter. The restrictive covenant at issue is not enforceable for three reasons. First, it's not supported by adequate consideration. Dr. Francis worked for Prairie Rheumatology for less than two years, and no additional consideration was provided. Second, there's no predictable interest here. This is a rheumatology practice that maintains a monopoly, and through its own testimony has suffered no harm and will continue to suffer no harm if the restrictive covenant is not enforced. And three, enforcing this restrictive covenant will cause the public to suffer substantial harm, and that was supported by the testimony of Prairie Rheumatology, the employer in this case. Let me begin by the issue of consideration. In restrictive covenants, the courts look to whether adequate consideration has been in place. And this is because courts in Illinois abhor monopolies or restraints on trade. That's exactly what exists in this case. Prairie Rheumatology is the only rheumatology practice within the restricted area, within the 14-mile radius. Dr. Maria Francis is a board-certified rheumatologist. Rheumatology is the care of patients who suffer from chronic pain and illness. Dr. Francis was recruited to join Prairie because she thought she would have the opportunity to help a practice grow, to build her own practice, and to really apply her business development skills as well. She was a real go-getter. However, after 15 months of employment, she realized that Prairie was not going to keep its promises to her. This is not a term employment agreement, but it did require 120 days' notice of termination by either side. So she gave the required 120 days' notice to protect her patients. So their relationship deteriorated after 15 months, and the employment terminated after 19 months. Even if this court decided not to follow Justice Carter's decision in Brown v. Mudron and the First District Appellate Court's decision in Fifield v. Premier Dealer Services, which held that a minimum of two years' continued employment is required to constitute a substantial period of employment for a restrictive covenant to be enforced, there was no additional consideration provided in this case. Specifically, Prairie promised in the contract, in the employment agreement, that in exchange for Dr. Francis to adhere to her obligations under the restrictive covenant, it would provide her with three things. First, assistance with obtaining privileges. Again, that's an illusory benefit. Prairie Rheumatology needed Dr. Francis to have privileges at the two hospitals, and yet Prairie did not even follow industry standard in terms of assisting Dr. Francis in obtaining privileges. Dr. Francis completed all the applications. She paid for one of the credentialing fees. All that Prairie did was download an application and sign it. Second, Prairie promised that it would introduce Dr. Francis to patients with whom it had established a near-permanent relationship. However, at the hearing, by Prairie's own testimony, it introduced over 90 percent of the patients treated by Dr. Francis were not patients with whom it had a near-permanent relationship. That's specific testimony from the employer. They are patients who either followed Dr. Francis from her previous employment or came to Dr. Francis through referrals. This is not a medical practice that spends any money on marketing or any time on marketing or any time cultivating relationships with referring physicians. In fact, the third thing that was promised to Dr. Francis was introductions to referring physicians and friends of the corporation. At the hearing, Prairie could not identify a single referring physician to whom it introduced Dr. Francis. Dr. Francis came to Prairie and realized Prairie was not doing any marketing, so she set up a website for Prairie and for herself to attract patients. She set up speaking engagements and seminars so that she could build relationships in the community. She contacted the hospital administration and asked them to send out email introductions to referring physicians. Prairie can't even identify who its referring physicians are. At the hearing, it produced publicly available website printouts of every single attending physician at the two hospitals as its referral sources. In this case, Prairie failed to follow through on its promises to Dr. Francis, and therefore there's no consideration. Council argued today that consideration is an abusive discretion review, but every case shows that it's a de novo standard, and especially here because the trial court applied an improper test, even if we could get beyond the two-year rule and the lack of additional consideration. The trial court looked to factors which this court in Brown and the First District in Fightfield specifically held to be improper. One of those factors is the fact that Dr. Francis resigned from employment. It's been very clearly held that that is not to be a factor in determining whether adequate consideration exists in an employment-related restrictive covenant. In Fightfield, it was implicitly held that the length and intensity of negotiations are, again, not a factor that should be considered in determining whether consideration exists. Therefore, we don't believe that the trial court should have ever gotten past the issue of consideration. The trial court found that Brown is in conflict with Fightfield, or that Fightfield is in conflict with Brown, and relied substantially on United States Federal Court Chief Justice Castillo's decision in Montel-Eisenstack. However, just shortly thereafter, former Chief Justice Hulderman found that the court in Brown, the rulings in Brown and in Fightfield are in line with each other, and that it is very likely that the Supreme Court will hold that there is a bright-line two-year minimum employment period required. And in that case, interestingly, the employees worked respectively for 18 months and 22 months. So even more time than Dr. Francis worked for Prairie Rheumatology. If we could get past the... If, somehow, a covenant could get past the consideration issue, which we believe it should not, and this decision should be reversed for that reason alone, there's no protectable interest here. All of the cases involving restrictive covenants in the employment cases require that the employer have a protectable interest. Essentially, counsel is asking this court to say a lower standard, that we value the relationship between patient and doctor even less than we value a transactional relationship. That an employer doesn't even have to spend money to develop its practice, spend time working on developing goodwill and building relationships, or protect confidential information or processes. That really, a physician's office can open up, maintain a monopoly, and still have the same protection as other businesses who actually have to invest time and money in building their business. In this particular case, it was Dr. Maria Sasenko, the founder of Prairie Rheumatology, who testified that the reason she wanted to enforce this restrictive covenant is to prevent competition. That is the explicit thing that is prohibited by every court. That cannot be the reason. The reason that we enforce restrictive covenants is to protect the investments that businesses make in building themselves, the investment that they make in their reputation, and all of the efforts that they go to to protect confidential information. It just doesn't exist here. The final reason why this restrictive covenant is not enforceable is that pursuant to Prairie's own testimony, this restrictive covenant would be substantially injurious to the public. Judge Anderson relied on the testimony of plaintiffs in this matter, of Prairie Rheumatology, in making this determination because Prairie Rheumatology's founder, Dr. Maria Sasenko, and one of the associates both testified how critical continuity of care is for rheumatology patients. Again, I reiterate that these are patients who suffer from chronic pain and injury, and it was the plaintiff in this matter, the employer in this matter, who testified as to that. There has not been a single case involving a physician employer where the employer came forward and said, yes, continuity of care is critical for our patients. The one thing that we agree on with counsel is that the judge misapplied this and said, well, yes, there's also a shortage of rheumatologists in the area. There's no other rheumatology practice within that 14-mile area. So the judge found that the injury to the public was to the general public and not to existing patients. We counter, though, that the injury is also to existing patients, and in fact, we've already, counsel and I, have already seen a problem with enforcing this injunction as the trial court blue-penciled it. There's a patient who was seen by Dr. Francis at Prairie Rheumatology who does suffer from chronic pain and illness and had no idea where she could go once Dr. Francis left. So she contacted Prairie Rheumatology and found out they no longer accept her insurance. Well, she contacted Dr. Francis within the restricted area, and Dr. Francis had to tell her she couldn't see her but couldn't say you can come see me outside the restricted area because that would be a violation of the non-solicit. This patient and this patient's spouse were distraught. They contacted counsel for both parties, and they wanted to involve the court in this matter. We actually had to come to an agreement specifically to have an exception to the restrictive covenant for this patient. Clearly, enforcing this injunction is going to continue to burden the court system and require the litigants to involve the court in the future. It's also clearly going to harm patients who seek necessary care. So for all those foregoing reasons, we ask that this court reverse. In the alternative, at a minimum, we ask that the court find that the standard for the factors applied in determining that consideration does exist be reversed and remanded so that the court can at least apply the correct factors to this. Any questions? I'll reserve my time. I want to address the injury to the public. Because even when I hear counsel, I'm concerned by it. But the problem that counsel raised was created by the defendant, by Dr. Francis. If she would have set up her office outside the 14 miles, one block outside, she'd be within a relatively small distance for her patients. She chose, however, because it was more economical for her. As the record showed, she got a nice contract with a nice salary with nice offices from Hinsdale Orthopedics to work for Hinsdale Orthopedics. And she's working in their office in Hinsdale, which her patients could go to Hinsdale, but she says that's too far away. And she has an office within about nine miles of Prairie, right next to Silver Cross Hospital, right next to the major referral source of Prairie Rheumatology. As the evidence showed, there are some 700 doctors at Silver Cross Hospital. It's the preeminent medical center practice for this area. The problem with the patients not being able to see Dr. Francis was the result of Dr. Francis deciding to open an office within the restricted area. If she opened an office outside the restricted area, isn't the issue always going to be the hospitals? No. And I thought that was pretty clear in the briefs that that was what was the major problem. No, the issue is where you're going to be, where you practice. This, as the appellant, the appellee said, this is a consulting practice. Most of the work is done at the offices. Your primary business is the offices. While you get referrals from doctors at the hospitals, they send the patients to go see you at their office. So if she goes outside the area, you don't have any problems. She can treat all the people, the 900 people she saw at Prairie, she can treat them there. She has to move a few miles away. She says it's going to be difficult for my can't-get-keep patients who are south to go up to Hinsdale if I have to move to Hinsdale. If she moved to an office 14.1 miles south of Prairie's offices, her can't-get-keep patients would be closer to her than even the Joliet offices, than even the Hinsdale orthopedics offices. She has chosen to violate the covenant because she got an office. She got a salary. She has a ready-made practice set up that we gave her. She had no patients when she got here. 136 people came from can't-get-keep to see her during this 19 months. The record shows at, I believe, Exhibit 51, that several of those patients, now that she has left, have transferred back to can't-get-keep because there's rheumatologists in can't-get-keep. So this whole issue of injury to public was created by Dr. Francis, not by Prairie. Judge Anderson ruled, and that ruling would have to be reversed based upon the manifest way of the evidence, that no reasonable person could make the same ruling as Judge Anderson. He found that Prairie has a legitimate interest in its patients and there was no injury to the public to have those patients see Prairie, I'm sorry, not see Dr. Francis, within the restricted area. Joliet is an area that is pretty widespread. I believe Plaintiff's Exhibit 50 was an exhibit showing the areas that Silver Cross Hospital operates in. And that exhibit shows that its service area, the hospital service area, goes to Orion Park, Bolingbroke to the north, Cole City to the south, Monee to the east, Kinley Park to the east, Morris to the west. So the hospital, where all these doctors are at, has got a huge service area. Thank you very much. Dr. Francis could easily move to an office, still servicing the area that Silver Cross Hospital has, still getting the same referrals who she met, all these referrals from us, she could still do that, she just has to be outside of 14 miles. That is why Judge Anderson's two rulings here, that is that you need to show a protectable business interest in future patients is against any evidence, and you should look at the rule because you misapplied the reliable fire equipment test. And it makes no sense to allow somebody to practice within the area and you have just the issue that counsel raised, that is a patient sees what wants to be treated by their doctor. And the only reason they can't be treated by Dr. Francis is because she set up within the restricted area. The second... As a practical matter, going back to my earlier point, she couldn't be using the hospital, right? If she needed to see patients or... I will tell you, I don't read that in the agreement. I think the agreement is fuzzy on whether she can practice at the hospitals. I have drafted those agreements, and frankly I may have drafted them a little differently, but we have asked the court 14 miles from Prairie's offices to keep her out of that area. Whether she can practice at the hospital, I frankly don't know. I think that is a tough call based on the language of the agreement. Anybody else? Thank you, Mr. Arturo. And Ms. Prince, you have five minutes to respond to the response to your comment, such as it was. I'll be brief. Thank you. Although counsel did not directly address the consideration issue, one thing that he did point, he did argue, was that Prairie provided Dr. Francis with all of these things and access to patients and referral sources. It's just not true. Essentially what they're saying is an employer doesn't have to keep its promises to the employees or doesn't have to perform its obligations under a contract, and that contract will still be enforced against the employee. Essentially they're just ignoring the substantial jurisprudence that holds that a minimum of two years of employment is required and that some additional consideration has to be provided. Regarding the protectable interest, the court did apply the right test. Judge Anderson specifically says that he's applying the test in reliable prior versus arendando. So even we as the cross-appellant understand that it's an abuse of discretion standard with respect to the protectable interest. However, we argue that no reasonable person could have found a protectable interest when every problem that is normally considered was testified by the employer not to exist here. There isn't a near-permanent relationship with patients. There's no money spent on marketing. There's no time and effort spent on building the goodwill here. It just doesn't exist at all. And finally and most importantly, the injury to the public was found based upon the employer's testimony. There is not a single case out there involving a medical practice where it's the employer who repeatedly emphasized the critical nature of continuity of care for their patients. So, yes, these patients should be able to continue to see Dr. Francis. I'm not really clear on what counsel is asking for because if counsel is asking for the restrictive covenant to be enforced as written, Dr. Francis would not be able to continue seeing these patients even outside the area because the agreement does say she is not to treat these patients. So if, which I think is what they're asking, that I think they're asking that the agreement be enforced as written and that would restrict Dr. Francis from servicing patients at the hospital. And the court did find that this would cause a number of problems for the patients and the public at large. Unless you have any questions. Thank you, Ms. Prince. And thank you, Mr. Fortunoff, for your arguments today. We will take this under advisement and back to the written exposition. Thank you.